# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL McKAY, | |
| Plaintiff, | Case No: 15 c 9522 |
| v. | Magistrate Judge Susan E. Cox |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

## ORDER

Plaintiff Michael McKay appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying him Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). For the reasons discussed more fully below, we remand this matter for further proceedings consistent with this opinion. Plaintiff's motion for summary judgment is granted [dkt. 9].

## STATEMENT OF FACTS

### I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB and Supplemental Security Income on October 5, 2009, alleging he became disabled on August 29, 2009, as result of injuries he suffered in a motor vehicle crash. R. 167-169, 320. Plaintiff went through the administrative process, which resulted in an administrative law judge ("ALJ") denying his application on May 18, 2011, following an administrative hearing. The ALJ determined that, despite suffering from a number of severe impairments, the plaintiff could still perform a very limited range of sedentary work, which allowed him to perform jobs like bench assembler, machine tender, and inspector. R. 24, 28. To reach that

conclusion, the ALJ relied on the testimony of the vocational expert from the administrative hearing. After the Appeals Council denied plaintiff's request for review, plaintiff filed suit in the Northern District of Illinois, seeking review of the decision under 42 U.S.C. §405(g).

On August 21, 2014, the court reversed the ALJ's decision and remanded the case to the Commissioner for further proceedings. *McKay v. Colvin*, No. 13 C 1535, 2014 WL 4186824 (N.D. Ill. Aug. 21, 2014). The court found that the vocational expert's testimony did not establish that plaintiff could perform jobs like bench assembler despite plaintiff's moderate restriction on his ability to maintain pace. *McKay*, 2014 WL 4186824, *3-4. The ALJ had found that the plaintiff had moderate restrictions on his concentration, persistence, and pace, but neither the ALJ nor the vocational expert clarified whether a person with such a restriction would be able to maintain the pace necessary to perform the jobs of bench assembler, machine tender, or inspector. *McKay*, 2014 WL 4186824, *3-4. The court was also troubled by the fact that the vocational expert had testified that a person could not be off task 30 percent of the time in those jobs, but hadn't said whether a moderate restriction would constitute being off task 30 percent of the time. *McKay*, 2014 WL 4186824, *3-4. On remand, the Appeals Council returned the case to the ALJ for further proceedings consistent with the court's order. R. 1149-1152.

On March 30, 2015, the ALJ convened another administrative hearing. R. 1018-1050. This time, when posing a hypothetical to the vocational expert, the ALJ asked her to bear in mind that, because of a moderate restriction in concentration persistence, and pace, a person could not do assembly line work; that he had to be able to spread his production throughout the day and not maintain the same pace hour after hour. R. 1044. The vocational expert said that such a person could still do work as a circuit board assembler, document preparer, or address clerk. R. 1043-1044.

2

These jobs would allow a person to be off task up to 15 percent of the time. R. 1044.

Following the hearing, the ALJ once again determined that plaintiff was capable of doing a very limited range of sedentary work. Again, relying on the vocational expert's testimony, the ALJ concluded that this allowed the plaintiff to perform jobs like circuit board assembler, document preparer, or address clerk. But, the ALJ further concluded that, under the the Medical Vocational Guidelines ("Grid"), once plaintiff turned 50 years old on January 6, 2015, he was disabled. R. 1008. That entitled plaintiff to SSI as of that date, but not to DIB, as plaintiff's insured status expired on September 30, 2014. R. 1006, 1008.

## II. THE MEDICAL RECORD

The plaintiff's odyssey through the Social Security Administration bureaucracy and his medical treatment following a motor vehicle accident have combined to produce a two-volume, 1700-page record. The bureaucratic portion alone amounts just over half of that, calling to mind Judge Posner's observation that many are understandably reluctant to undergo the arduous application process until driven to do so by desperation. *Cole v. Colvin*, – F.3d –, –, 2016 WL 3997246, at *3 (7th Cir. July 26, 2016). As this is now the plaintiff's second trip to federal court to challenge the denial of his application for disability insurance benefits, the summary of the medical record will be kept as brief as possible.

Before August 29, 2009, the plaintiff worked as an electrician for over 20 years. R. 1281-1282, 1321-1326. But, then he drove his vehicle into a utility pole at a high rate of speed. R. 320. He suffered traumatic brain injury, and fractures of the left femur, multiple ribs, jaw, sternum, and hip. R. 327, 402. His brain injury left him with significant cognitive impairments; he needed a 24-hour-a-day attendant and was incapable of making his own medical or legal decisions. R. 400. He

3

had to be placed on a ventilator and fed through a tube. R. 327, 369, 375, 400. Surgical repairs were done to his jaw, pelvis, and left femur. R. 398, 454. He was comatose for about a month following surgery. R. 715.

After about a month-long hospital stay, plaintiff was transferred to the Rehabilitation Institute of Chicago. R. 476, 497. He was alert and oriented, but confused as to whom he lived with. R. 476. Over the course of his stay, he underwent therapy sessions to help him adjust emotionally to his disability. R. 491-495. By the end of his time there, he had improved greatly, but continued to exhibit significant cognitive impairment, especially in terms of memory problems. R. 485. He would require continuous supervision, and moderate assistance getting around, but he would no longer need a feeding tube. R. 485, 502-503. He was transferred to the HCR ManorCare facility on October 30, 2009. R. 508.

After another month-long stay, plaintiff was discharged to continue home physical and occupational therapy. R. 509. He still exhibited memory loss, remaining forgetful and confused. R. 517. His judgment and insight were impaired. R. 518. He suffered from weakness, joint pain, leg cramps, and difficulty breathing. R. 517. When physical therapy sessions began, plaintiff complained of pain he rated at 8 or 9 on a 10-point scale after sitting for an hour and was confined to a wheelchair. R. 659. In December 2009, after a month of thrice-weekly sessions, plaintiff could walk with a walker under supervision; his weight bearing was reduced to 50%. R. 657. In January 2010, plaintiff was able to use a cane for a short distance under supervision, was at 85% of normal weight bearing, and he rated his pain at 5/10. R. 655. By April 2010, plaintiff rated his pain at 2-3/10 after sitting for an hour, he could walk for 15 minutes with a cane, and stand at a counter for 20 minutes. R. 647.

4

At that time, plaintiff's orthopedic surgeon, Dr. Troy, who had reconstructed his hip, reported that plaintiff could not return to work until further notice. R. 660, 733. Shortly thereafter, in May 2010, Dr. Troy had to remove a hypertrophic bone spur and hardware from plaintiff's left leg. R. 728. In June 2010, Dr. Troy reported that plaintiff continued to improve, but explained that it would "be quite a while until he will be able to go back to work as he has also sustained head trauma during the accident and he has resulting problems with his leg function thereafter." R. 717. Improvement continued through September 2010, but, over a year after plaintiff's accident, Dr. Troy reported that plaintiff would still need another 3 to 5 months of physical therapy. R. 715. Plaintiff's gait was slow due to his brain injury. R. 715. The doctor noted that plaintiff was working hard to get back to work, but that he was "most likely headed for long-term disability." R. 715.

Plaintiff was discharged from physical therapy in November 2010; he had "maxed out." R. 981. In December of 2010, Dr. Troy reported that plaintiff was still having significant problems with his left leg, suffering pain in his knee and hip. R. 980. He had to take anti-inflammatory drugs and narcotic pain relievers on a regular basis. R. 980. Dr. Troy felt he was a good candidate for disability, as he was unable to sit or stand for longer than 30 or 45 minutes. R. 980.

Not surprisingly, plaintiff's difficulties impacted his psychological well-being. He began seeing a psychiatrist, Dr. Lelio, in April 2010, and a therapist, Ms. Dillberg, in December 2010. R. 788, 972. At their initial session, plaintiff told Dr. Lelio that he worried he would never be able to work again. R. 976. Dr. Lelio diagnosed plaintiff with generalized anxiety disorder and prescribed Ambien and Xanax. R. 976. In May, plaintiff told Dr. Lelio that the medication was helpful but he was still a bit depressed about his situation. R. 977. By November, plaintiff was still anxious and depressed, but didn't want to add an anti-depressant to his medication regimen. R. 979. In March

5

2011, Dr. Lelio reported that plaintiff's loss of self esteem affected his daily activities and his condition impacted his ability to sustain concentration and attention resulting in failure to complete tasks. R. 972-973. In January 2011, Ms. Dillberg reported plaintiff suffered from extreme restrictions on his ability to get through daily activities, maintain social functioning, and maintain concentration, persistence, and pace. R. 788. She didn't think he would be able to perform in any work setting. R. 787.

### III. THE PLAINTIFF'S TESTIMONY

At his administrative hearing, the plaintiff testified at length regarding his limitations and how his life changed after his accident. As a result of his brain injury, simple tasks are difficult for him, like writing a check. R. 1027-1028. He gets confused easily. R. 1027. His sister helps him with some things; his wife had helped before, but they were divorced a few months before the hearing. R. 1028. He has pain all down his left side, from his shoulder to his hip, and in his foot. R. 1031, 1035. He can't walk very far without a cane. R. 1032. He is only able to sit for about a half hour before he has to get up and stretch to relieve the pain. R. 1035. The pain interferes with his concentration, and he is easily distracted. R. 1035, 1037.

### IV. THE ALJ'S DECISION

As already noted, on remand, after reviewing the evidence a second time and conducting a second administrative hearing, the ALJ found that plaintiff was not disabled prior to January 6, 2015 and, therefore, not entitled to DIB. The ALJ determined that, despite a number of severe impairments – status post motor vehicle accident with multiple injuries including traumatic brain injury; fractures of the pelvis, left femur and hips; generalized anxiety disorder; dysthymic disorder; and hepatitis C – the plaintiff retained the residual functional capacity to perform a very limited

range of sedentary work. R. 996, 998-999. The limitation to sedentary work meant that plaintiff could sit for approximately six hours of an eight-hour workday, walk or stand for no more than about two hours of an eight-hour workday, and only occasionally lift up to ten pounds. R. 998; 20 C.F.R. §§404.1567(a), 416.967(a); *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995). In addition to those restrictions, the ALJ found that plaintiff could never climb ladders, ropes, or scaffolding; could only occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs; could not operate foot controls with his left leg; had to be allowed to use a cane at work; and had to be allowed change positions from sitting to standing every 30 minutes for 5 minutes at a time, but stay on task while doing so. R. 998. The ALJ also found that plaintiff had a number of cognitive limitations: he could only perform work that involved simple instructions and that was routine and repetitive; the work could not involve any interaction with the public; it could not be assembly line work; and it had to be low stress work that did not involve more than occasional decision-making and changes in the work setting. R. 998-999. Finally, the ALJ also found that plaintiff could only work in an environment that was relatively quiet. R. 999. Despite all these limitations, the ALJ – relying on the vocational expert's testimony – concluded that plaintiff's RFC allowed him to do jobs like circuit board assembler, document preparer, or address clerk. R. 1007. Once the plaintiff turned 50 years old on January 6, 2015, however, the Grid directed a finding that he was disabled. R. 1007-1008. This meant that he qualified for SSI as of his 50th birthday, but not DIB, as his insured status had expired September 30, 2014, just 3 months earlier. R. 1008.

## **DISCUSSION**

### **I. STANDARD OF REVIEW**

The ALJ's decision must be upheld if it follows the administrative procedure for determining

whether the plaintiff is disabled as set forth in the Act, if it is supported by substantial evidence, and if it is free of legal error. 20 C.F.R. §§ 404.1520(a), 416.920(a); 42 U.S.C. § 1383(c). This Court must reverse if there is an error of law, even if the evidence adequately supports the conclusion. *Schmoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless build a "logical bridge" between the evidence and his conclusion. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). A "minimal [ ] articulat[ion]" of the ALJ's justification is enough. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).

## II. ANALYSIS

### A. The Borderline Age Situation

The plaintiff's lead argument in this case has to do with his age and the ALJ's finding that he was disabled when he turned 50 on January 6, 2015, but not before. Because the plaintiff's insured status expired slightly over three months before that, on September 30, 2014, plaintiff was not entitled to DIB, only SSI. The age 50 cutoff was based on the Commissioner's Medical-Vocational Guidelines, or "Grid." The Grids reflect the Social Security Administration's determination that certain combinations of age, education, work experience, and exertional limitations direct a finding of either disabled or not disabled at step five of the disability analysis. 20 C.F.R. § 404.1569; 20 C.F.R. Pt. 404, Subpt. P., App. 2 § 200.00(a); *Haynes v. Barnhart*, 416 F.3d 621, 627-30 (7th Cir. 2005). At age 50, a person is considered to be in the "closely approaching advanced age" category, which takes in ages 50-54. Once a person falls into the "closely approaching advanced age" category, the Commissioner assumes that there may be a serious effect on their ability to adjust to work other than the kind they are used to. 20 C.F.R. § 404.1563(d). For example, in this case, the plaintiff worked as a union electrician, a skilled position, for 21 years

before his accident. With the very limited RFC the ALJ found, the plaintiff is unable to do that work any more and his skills are not transferable. He would have to make a vocational adjustment to other work; unskilled work like address clerk, document preparer, or circuit board assembler. The Commissioner's Grid says he could do that as a younger individual aged 45-49, 20 C.F.R. Pt. 404, Subpt. P., App. 2 § 201.21, but not as an individual "closely approaching advanced age." 20 C.F.R. Pt. 404, Subpt. P., App. 2 § 201.14. And so, the ALJ found that plaintiff was not disabled before his 50th birthday, but disabled once he turned 50. R. 1006-1008.

When plaintiff's insured status expired, he was only about 3 months shy of his 50th birthday. Again, had he been closely approaching advanced age before that expiration date, he would have qualified for DIB under the Grid. Given the circumstances, the plaintiff argues that the ALJ was draconian with the cutoff date. In fact, the plaintiff argues that the ALJ ignored the Commissioner's regulations related to circumstances just like this: borderline cases where age makes all the difference between a favorable opinion and an unfavorable one. The regulations provide:

> How we apply the age categories. When we make a finding about your ability to do other work under § 404.1520(f)(1), we will use the age categories in paragraphs (c) through (e) of this section. We will use each of the age categories that applies to you during the period for which we must determine if you are disabled. We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. § 404.1563(b). The plaintiff was certainly within a few months – three months and a week – of reaching an older age category which, if applied, would have resulted in a determination that he was disabled and entitled to DIB. But, the ALJ didn't give plaintiff the benefit of the doubt. She applied the age categories mechanically.

9

Of course, under the wording of the applicable regulation, the ALJ has discretion to be generous or exacting. But the regulation does mandate that the ALJ "consider whether to use the older age." 20 C.F.R. § 404.1563(b). The ALJ made no mention of her thought process in this regard, saying only that she "f[ou]nd no vocational adversities" and chose not to "apply the Grid rue [sic] concerning age non mechanically." R. 1006. The ALJ didn't discuss what "vocational adversities" might be.

Courts in this district generally require some explanation of the ALJ's thought process regarding application of age categories in borderline cases. *Pelech v. Colvin*, No. 14 C 7021, 2016 WL 727208, at *7 (N.D. Ill. Feb. 22, 2016); *Figueroa v. Astrue,* 848 F. Supp. 2d 894, 896 (N.D. Ill. 2012); *Anderson v. Astrue*, 2011 WL 2416265, *11 (N.D.Ill. 2011); *Freundt v. Massanari*, 2001 WL 1356146, *19 (N.D.Ill. 2001). The requirement of an explanation isn't conjured out of the ether. The regulation specifically says that ALJs "will consider" whether to give a claimant the benefit of the doubt in borderline cases. The Seventh Circuit has long required that, in every case, an ALJ build a "logical bridge" between the evidence and her conclusion to allow a court to trace the path of an ALJ's reasoning. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). An ALJ must supply enough detail and clarity to permit meaningful review. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). The ALJ's bare statement in this case, that she applied the Grid mechanically because there are no vocational adversities, without more, is simply inadequate, and this case must be remanded.

Going a step or two beyond the ALJ's conclusory determination, the necessity of a remand becomes all the more clear upon any attempt to figure out if the ALJ applied the regulations correctly in this case. As just noted, we don't know from the ALJ's decision what a vocational adversity might be or whether the ALJ considered any. At the time of the decision, the

Commissioner's "Hearing, Appeals, and Litigation Law Manual" ("HALLEX") explained it this way:

> [T]he claimant must show progressively more vocational adversity(ies)—to support use of the higher age—as the time period between the claimant's actual age and his or her attainment of the next higher age category lengthens.
>
> One finds additional vocational adversity(ies) if some adjudicative factor(s) is relatively more adverse when considered in terms of that factor's stated criteria, or when there is an additional element(s) which has adverse vocational implications. Examples of these additional vocational adversities are the presence of an additional impairment(s) which infringes upon—without substantially narrowing—a claimant's remaining occupational base; or the claimant may be barely literate in English, have only a marginal ability to communicate in English, or have a history of work experience in an unskilled job(s) in one isolated industry or work setting. (An isolated industry would be such as fishing or forestry.) Other adverse circumstances in individual cases may justify using the higher age category.

HALLEX II–5–3–2(Nov. 2, 1993)(quoted in *Figueroa,* 848 F. Supp. 2d at 896).[1] The explanation of what constitutes an additional vocational adversity is not particularly illuminating. When the opacity of the HALLEX is combined with the absence of any discussion by the ALJ, any review of the ALJ's decision would be speculative at best, and certainly not meaningful.

The parties do their best to flesh this out, focusing on the HALLEX's example of example of "additional impairment(s)." The plaintiff submits that his impairments of carpal tunnel syndrome and hepatitis C are additional impairments that constitute, or result in, additional vocational adversities. The Commissioner argues that the carpal tunnel syndrome had resolved with surgery and plaintiff has had hepatitis C for 20 years and was not seeking any treatment for it. Valid points,

---

[1] This provision was removed on March 25, 2016, and replaced with HALLEX I-2-2-42. https://www.ssa.gov/OP_Home/hallex/TS/tsii-5-11.html. Interestingly, the new HALLEX provision – which was not in effect at the time of the ALJ's decision – requires ALJs to specifically explain their decision regarding the borderline age situation and to indicate the specific factors considered. https://www.ssa.gov/OP_Home/hallex/I-02/I-2-2-42.html. Thus, under the current version of the provision, there would be yet another reason to remand this case in addition to the Seventh Circuit's logical bridge requirement and the decisions of the courts in this district.

but as the ALJ did not discuss her reasoning, the Commissioner is veering into forbidden territory; providing support for an ALJ's conclusions that are not found in the ALJ's opinion. The Court's review is limited to rationale the ALJ supplies; reasoning that the Commissioner's lawyers come up with later on does not enter into the calculus. *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015). And, it cannot be ignored that, from the ALJ's first decision in May 2011 to her second decision in March 2015, the available job base for plaintiff had eroded by half, dwindling from 8000 to 4000. R. 1007, 1064. With factors like this in the record – factors which the ALJ seemed to ignore – the requirement that an ALJ explain her decision is underscored, as is the need for a remand in this case.

Moreover, the current Social Security Administration's guidance for ALJ's consideration of additional vocational adversities suggests that the parties might be down the wrong path regarding additional impairments. In addition to the HALLEX, the Social Security Administration also has a Program Operations Manual System ("POMS"). The section covering borderline age cases, DI.25015.006, suggests that additional impairments are those that do not reduce an RFC from one level to another – say, from light work to sedentary work – but do reduce the vocational base within that RFC. The section gives the example of an individual of borderline age with a light RFC who has an additional impairment that precludes overhead reaching. This would not erode the base enough to drop the individual to a sedentary RFC, but it would be enough to support placing the individual in the higher age category. https://secure.ssa.gov/apps10/poms.nsf/lnx/0425015006. If the individual had an additional impairment that did significantly erode the light work vocational base – the section cites a 4-hour limitation on standing/walking as an example – that would reduce the RFC category to sedentary and, as the additional impairment was already accounted for, it would be inappropriate to account for it again by also placing the individual in the next highest age

category. https://secure.ssa.gov/apps10/poms.nsf/lnx/0425015006.

In this case, the ALJ determined that plaintiff's RFC was for sedentary work, the lowest category. As such, the ALJ could not account for the plaintiff's additional impairments – like his traumatic brain injury or his depression and anxiety – by dropping the plaintiff into a lower work category. There is no danger of "double-weighing", as the POMS calls it. https://secure.ssa.gov/apps10/poms.nsf/lnx/0425015006. So, despite the ALJ's conclusory statement that there simply are no vocational adversities, it would seem, based on guidance from the current POMS, that there are additional impairments that infringe on the remaining occupational base; in other words, that there *are* vocational adversities. Now, neither the current versions of the HALLEX or the POMS were in effect at the time of the ALJ's decision, and neither have the force of law, *Christensen v. Harris Cnty.,* 529 U.S. 576, 587 (2000)(agency interpretations "are entitled to respect, " but only to the extent that they have "the power to persuade."); *Dean v. Colvin*, 585 F. App'x 904, 905 (7th Cir. 2014)(". . . we need not decide whether the [HALLEX], which is designated as a guide rather than a regulation, establishes rights enforceable by claimants."); *Davenport v. Astrue*, 417 F. App'x 544, 547 (7th Cir. 2011)("Circuits are split over whether the HALLEX creates enforceable rights.");*Parker for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989)("The POMS manual has no legal force and therefore the standard cannot be controlling in this case."); , 891 F.2d 185, 190 (7th Cir. 1989)("The POMS manual has no legal force and therefore the standard cannot be controlling in this case."), but without anything from the ALJ that allows a court to follow the path of her reasoning, they are at least breadcrumbs. And, without anything more than a conclusory statement from the ALJ, they seem to lead down a different path that the ALJ took.

Accordingly, this matter must be remanded to the Commissioner. That is not to say that the

ultimate result the ALJ reached was wrong. It may well be that there are no additional vocational adversities or that they do not warrant an allowance to an age category that plaintiff missed by just three months. But the court cannot simply take the ALJ's word on it. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, . . . if, while there is enough evidence in the record to support the decision, the reasons given by the [ALJ] do not build an accurate and logical bridge between the evidence and the result.").

### B. The Vocational Evidence

Because the ALJ's treatment of borderline age issue necessitates a remand, there is no need to address the plaintiff's remaining arguments, *see Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014), but at least one does merit some discussion. The plaintiff doesn't think that the ALJ adequately addressed the concerns the court had with her previous decision. The court remanded this case previously because:

> the VE state[d] that a person would, indeed, need to keep a consistent pace when responding to the question of whether a person suffering from moderate restrictions would need to maintain a consistent pace throughout the day. We know from the ALJ's RFC determination that plaintiff has moderate restrictions in concentration, persistence, and pace. But after introducing the jobs available to plaintiff, neither the ALJ nor the VE clarif[ied] whether a person suffering from moderate restrictions would be able to keep the consistent pace the jobs require. The VE also state[d] that if a person was off-track 30 percent of the time or more because of pain or concentration, "it would be noticed and they would lose their job." Here, again, we do not know if plaintiff's moderate restrictions constitute being off-track 30 percent of the time.

*McKay*, 2014 WL 4186824, at *3. The plaintiff argues that the ALJ didn't improve on this in the second hearing because the VE didn't address whether plaintiff's difficulties with maintaining pace would be a problem with the particular jobs – circuit board assembler, document preparer, address clerk – that the VE identified. But, on remand, the ALJ posited moderate concentration, persistence,

14

and pace problems in her hypothetical to the VE, and translated that into a restriction against "assembly line work" for the VE, explaining that by assembly line work, she meant work where the individual would have to maintain a consistent pace hour after hour. R. 1044. The VE testified that the jobs she cited would not be ruled out by such a restriction. R. 1044. So, the VE did in fact testify that a person with plaintiff's difficulties maintaining pace would be able to perform those jobs. Nothing more was required by the court's previous decision. *See, e.g.*, *Hofslien v. Barnhart,* 2006 WL 470178, *3, 172 Fed. App'x. 116 (7th Cir. March 1, 2006) (hypothetical adequately captured plaintiff's moderate restrictions in maintaining concentration, persistence and pace by limiting production pressures and prohibiting assembly line work).

That being said, on remand, if the case progresses to the point of examples of work plaintiff can perform despite his capacity for a very limited range of sedentary work, a closer look at those examples would be in order. The Seventh Circuit has, over the last few years, focused its scrutiny on the testimony of vocational experts regarding the type of jobs that a plaintiff can do and how many of those jobs exist. *Dimmett v. Colvin*, 816 F.3d 486, 488–89 (7th Cir. 2016); *Forsythe v. Colvin*, 813 F.3d 677, 680 (7th Cir. 2016); *Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). Vocational experts and their testimony have not fared well under the court's scrutiny. The kinds of concerns that the Seventh Circuit has had with such testimony are concerns here as well.

In this case, the VE cited three jobs that plaintiff could perform despite his very limited capacity for sedentary work: circuit board assembler, document preparer, and address clerk. There were, according to the VE, about 4000 of these jobs in the plaintiff's region. The VE stated that her testimony was consistent with the Dictionary of Occupational Titles, but a look at the entries she

15

relied on for her testimony does tend to cast some doubt on whether the plaintiff could do such work. For example, the VE cited circuit board assembler, DOT 726.684-110. As the job is described, it's rather exacting and detailed work:

> Inspects printed circuit board (PCB) assemblies for defects, such as missing or damaged components, loose connections, or defective solder: Examines PCB's under magnification lamp and compares boards to sample board to detect defects. Labels defects requiring extensive repairs, such as missing or misaligned parts, damaged components, and loose connections, and routes boards to repairer. Performs minor repairs, such as cleaning boards with freon to remove solder flux; trimming long leads, using wire cutter; removing excess solder from solder points (connections), using suction bulb or solder wick and soldering iron; or resoldering connections on PCB's where solder is insufficient. Maintains record of defects and repairs to indicate recurring production problems. May reposition and solder misaligned components. May measure clearances between board and connectors, using gauges.

http://www.occupationalinfo.org/72/726684110.html. It's difficult to imagine a person like the plaintiff, whom the ALJ found could not perform detailed tasks and had trouble concentrating, holding down such a job.

The job of document preparer, DOT 249.587-018, is described as fine work requiring focus as well. The job is preparing documents for microfilming, and among other tasks, involves cutting documents to microfilm size using razor knives or paper cutters. http://www.occupationalinfo.org/24/249587018.html. Add to plaintiff's concentration issues the element of the ALJ's RFC and hypothetical that allows the plaintiff to change positions form sitting to standing for 5 minutes every 30 minutes *while remaining on task* and, again, doubts arise. It's possible, perhaps, for an individual with the plaintiff's very limited RFC to perform these jobs, but it's not exactly self-evident. *See, e.g., Dimmett*, 816 F.3d at 489(comparison of plaintiff's limitations with tasks the cited jobs actually require "should have caused alarm bells to ring"); *Allensworth v. Colvin*, 814 F.3d 831, 835 (7th Cir. 2016)(vocational expert cited examples of jobs in response to

ALJ's hypothetical, "[y]et the vocational expert never explained whether the plaintiff could actually perform them."); *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010)(a person who could do "occasional typing" could not perform work that required "frequent fingering").

Beyond that, do such jobs even exist or, at least, exist in significant numbers? The Seventh Circuit has repeatedly expressed concerns with the obsolescence of many of the job listings in the Dictionary of Occupational Titles. *Dimmett*, 816 F.3d 486, 489 (7th Cir. 2016); *Herrmann*, 772 F.3d at 1113; *Browning*, 766 F.3d at 709. That's certainly a concern in this case as well. For example, the job of address clerk– in which the worker "addresses by hand or typewriter envelopes, cards, advertising literature, packages, and similar items" – has not been observed for *40 years*. http://www.occupationalinfo.org /20/209587010.html. Perhaps with good reason because, as the Seventh Circuit observed last year while questioning whether such a job existed at all, let alone in significant numbers:

> does anyone use a typewriter any more? Most addressing nowadays is either personal, as when one is sending a Christmas or get-well card, or automated, as in the case of business mailings, including mass mailings of advertisements or magazines.

*Alaura v. Colvin*, 797 F.3d 503, 508 (7th Cir. 2015). The other two job examples – circuit board assembler and document preparer – are only a bit better; those entries were updated in 1986. Still they are 30 years out of date, and the Seventh Circuit has expressed understandable skepticism regarding the continued existence of jobs involving microfilm. *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015). As is often the case, the source of the VE's estimate of the number of any of these jobs currently in existence is not known, as the DOT contains no statistics regarding the number of jobs in a given job category that exist in the local, state, or national economy. *Herrmann*, 772 F.3d at 1113. On remand, the ALJ, and the VE, would do well to bear in mind the questions raised by the

VE's testimony in this case.

## **CONCLUSION**

For the reasons discussed more fully above, we remand this matter for further proceedings consistent with this opinion. Plaintiff's motion for summary judgment is granted [dkt. 9].

**ENTER:**
**DATED:**
**10/31/16**

_____
Susan E. Cox, U.S. Magistrate Judge